IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE: | : | |
| | : | MDL NO. 1675 |
| ACE LIMITED SECURITIES | : | |
| LITIGATION | : | |
| | : | |
| | : | |

## Defendants' Supplemental
## Memorandum Of Law In Support Of Motion To Dismiss

Stephen A. Cozen
George M. Gowen III
COZEN O'CONNOR
1900 Market Street
Philadelphia, Pennsylvania 19103
(215) 665-2020

H. Lee Godfrey
Neal S. Manne
Johnny W. Carter
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
(713) 651-9366

Jeremy Brandon
SUSMAN GODFREY LLP
901 Main Street, Suite 5100
Dallas, Texas 75202-3775
(214) 754-1900

*Attorneys for Defendants ACE Limited, Evan*
*G. Greenberg, Brian Duperreault, and*
*Philip V. Bancroft*

## Table of Contents

Table of Authorities ...........................................................................................................iii-vi

1. **Is the efficient market hypothesis always a reliable indicia of materiality?**.................1

    A.    The efficient market hypothesis does not establish materiality of an alleged misrepresentation which has an insignificant impact on a company's total financial picture.............................................................................3

    B.    The efficient market hypothesis does not establish the materiality of an alleged misrepresentation which is not related to the revelation which preceded the stock drop. ........................................................................5

    C.    The efficient market hypothesis does not establish the materiality of an alleged misrepresentation which merely is a soft "positive portrayal" of the company. .................................................................................5

    D.    The efficient market hypothesis did not salvage plaintiffs' allegations in other cases involving contingent commissions and/or bid rigging in the insurance industry. ...........................................................................9

        1.    *Marsh* ....................................................................................9

        2.    *HRH* .....................................................................................12

2. **Should the efficient market hypothesis be revisited in light of the PSLRA?** .............13

3. **Has application of the efficient market hypothesis been questioned by any court or commentator?**................................................................................................13

4. **Can a court, at the motion to dismiss stage, assess the allegations of the financial impact of the alleged fraud against the company's total financial picture?**...............14

5. **If the amounts involved in the contingent commissions and bid-rigging schemes are insignificant, are they material?** ...................................................................14

6. **What is the economic loss if the stock price rebounded within six weeks?** ................15

7. **How is the $500,000 advance to Willis fraudulent?** ......................................................15

8. **Is the loss causation element satisfied when there is a drop in stock price on the basis of allegations of wrongdoing that soon proved insignificant or without foundation?**...................................................................................................16

9. **Has the *Tellabs* decision affected the application or the viability of the efficient market theory?** ...........................................................................................18

10.    What facts, if any, can the plaintiffs add in an amended complaint relating to the elements of scienter, loss causation and economic GAAP violations? ........................20

11.    Can a court consider pre- and/or post-class period admissions/proofs about the schemes? .............................................................................................................................21

12.    Can the class be limited to those who purchased and sold shares during the class period? .....................................................................................................................22

13.    Does 15 U.S.C. § 78u-4(e), which governs limitations on damages, affect the maximum amount of damages the plaintiffs can recover? ..........................................22

# Table Of Authorities

## Cases

*In re Advanta Corp. Securities Litigation,*
    180 F.3d 525 (3d Cir. 1999)..............................................................6, 7, 18

*In re AXIS Capital Holdings, Ltd., Securities Litigation,*
    456 F. Supp. 2d 576 (S.D.N.Y. 2006)............................................11, 17, 20, 21

*Basic Inc. v. Levinson,*
    485 U.S. 224, 108 S. Ct. 978, 991-92 (1988) ....................................................1

*Berckeley Investment Group, Ltd. v. Colkitt,*
    455 F.3d 195 (3d Cir. 2006)...............................................................5, 16, 17, 18

*In re Burlington Coat Factory Securities Litigation,*
    114 F.3d 1410 (3d Cir. 1997)............................................................3, 5, 14, 21

*California Public Employees' Retirement System v. The Chubb Corp.,*
    394 F.3d 126 (3d Cir. 2004)..........................................................................21

*Dura Pharmaceuticals, Inc. v. Broudo,*
    544 U.S. 336, 125 S. Ct. 1627 (2005)...........................................................5, 15, 16

*GSC Partners CDO Fund v. Washington,*
    368 F.3d 228 (3d Cir.2004)..........................................................................21

*Galati v. Commerce Bancorp, Inc.,*
    2005 WL 3797764 (D.N.J. Nov. 7, 2005) ....................................................6, 7

*Galati v. Commerce Bancorp, Inc.,* 220 Fed. Appx. 97 (3d Cir. 2007)............................................8

*Hersch v. DeWitt Stern Group, Inc.,*
    841 N.Y.S.2d 516 (App. Div. 2007) ...............................................................17

*Hillson Partners Ltd. Partnership v. Adage, Inc.,*
    42 F.3d 204 (4th Cir. 1994) .........................................................................4

*In re Intelligroup Securities Litigation,*
    527 F. Supp. 2d 262 (D.N.J. 2007) ...............................................................1

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.,*
    432 F. Supp. 2d 571 (E.D. Va. 2006) ............................................12, 13, 20, 21

*Key Equity Investors Inc. v. Sel-Leb Marketing Inc.,*
    246 Fed. Appx. 780 (3d Cir. 2007)................................................................8

*Lun v. Bank of America,*
    361 F.3d 217 (3d Cir. 2004)......................................................................21

*In re Marsh & McLennan Companies, Inc. Securities Litigation,*
    501 F. Supp. 2d 452 (S.D.N.Y. 2006).................................9, 10, 11, 12, 17, 19, 20

*McCabe v. Ernst & Young, LLP,*
    494 F.3d 418 (3d Cir. 2007)......................................................................16

*In re Mego Finance Corp. Sec. Litigation,*
    213 F.3d 454 (9th Cir. 2000) ...................................................................23

*In re Midway Games, Inc. Securities Litigation,*
    332 F. Supp. 2d 1152 (N.D. Ill. 2004) ..........................................................6

*Oran v. Stafford,*
    226 F.3d 275 (3d Cir. 2000)....................................................................2, 8

*Parnes v. Gateway 2000, Inc.,*
    122 F.3d 539 (8th Cir. 1997) ....................................................................4

*PEC Solutions, Inc. Securities Litigation,*
    2004 WL 1854202 (E.D. Va. May 25, 2004) ..................................................18

*People v. Liberty Mutual Ins. Co.,*
    861 N.Y.S.2d 294, 295 (App. Div. 2008) ......................................................16

*Raab v. General Physics Corp.,*
    4 F.3d 286, 289 (4th Cir. 1993) .................................................................5

*Smith v. Circuit City Stores, Inc.,*
    286 F. Supp. 2d 707 (E.D. Va. 2003) ...........................................................4

*In re Sofamor Danek Group, Inc.,*
    123 F.3d 394 (6th Cir. 1997) ....................................................................9

*Staehr v. The Hartford Fin. Servs. Group, Inc.,*
    460 F. Supp. 2d 329 (D. Conn. 2006)..........................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    127 S. Ct. 2499 (2007)........................................................................18, 19

*Unger v. Amedisys, Inc.,*
    2003 WL 25739165 (M.D. La. Aug. 1, 2003) .................................................13

*Winer Family Trust v. Queen,*
    503 F.3d 319 (3d Cir. 2007)..........................................................................................19, 20

## Federal Statutes and Rules

15 U.S.C. § 78u-4(b)(2) ..................................................................................................18

15 U.S.C. § 78u-4(e) ..............................................................................................14, 15, 22

FED.R.CIV.P. 15(a)........................................................................................................21

## Miscellaneous

Jeffrey L. Oldham, *Taking "Efficient Markets" Out of the Fraud-on-the-Market Doctrine*
    *After the Private Securities Litigation Reform Act,* 97 Nw. U. L. Rev. 995, 998
    (2003)..............................................................................................................13

Nathaniel Carden, *Implications of the Private Securities Litigation Reform Act of 1995*
    *for Judicial Presumptions of Market Efficiency,* 65 U. Chi. L. Rev. 879 (1998) ..............14

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE: | : | |
| | : | MDL NO. 1675 |
| ACE LIMITED SECURITIES | : | |
| LITIGATION | : | |
| | : | |
| | : | |

## Defendants' Supplemental
## Memorandum Of Law In Support Of Motion To Dismiss

Defendants submit this Supplemental Memorandum of Law to address the questions posed in the Court's order dated October 16, 2008. As set forth in response to the questions below, plaintiffs cannot convert their antitrust allegations into a securities claim. They have not alleged any misrepresentations – much less material misrepresentations that caused an economic loss.

**1.    Is the efficient market hypothesis always a reliable indicia of materiality?**

No.

As a threshold matter, the Court does not need to reach the question of whether the alleged misrepresentations were material. As discussed in defendants' prior briefs, defendants had no duty to make any disclosures, material or otherwise, during the class period regarding contingent commissions or alleged bid rigging.

If the Court does reach the question of materiality of alleged misrepresentations, it should conclude that the efficient market hypothesis does not establish that any representation or omission by ACE was material. *In re Intelligroup Secs. Litig.*, 527 F. Supp. 2d 262, 291 (D.N.J. 2007) ("The concept of materiality cannot be distilled into a bright-line test.").

The efficient market hypothesis is a presumption that available information is immediately and accurately incorporated into a stock's share price. *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47, 108 S. Ct. 978, 991-92 (1988). The usual application of this theory in securities law is to support a presumption of reliance in efficient markets. *Id.* It has sometimes been applied to the materiality element of a securities claim, in that materiality sometimes "may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock." *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000). This principle is not absolute; misleading or incorrect information can cause a stock drop but should not for that reason be deemed material. But apart from that deficiency, the efficient market hypothesis, even if it is assumed to accurately determine the ***materiality of information resulting in a stock drop***, does not provide a basis for determining the ***materiality of an issuer's alleged misrepresentations or omissions*** -- the key facts that must be adequately alleged for a securities complaint to withstand a motion to dismiss.

There are many situations in which the efficient market hypothesis does not reliably indicate materiality of an alleged misrepresentation or omission.

- The efficient market hypothesis does not establish materiality of an alleged misrepresentation which has an insignificant impact on a company's total financial picture.

- The efficient market hypothesis does not establish the materiality of an alleged misrepresentation which is not related to the revelation which preceded the stock drop.

- The efficient market hypothesis does not establish the materiality of an alleged misrepresentation which is merely is a soft "positive portrayal" of the company.

- The efficient market hypothesis did not salvage plaintiffs' allegations in other cases involving contingent commissions and/or bid rigging in the insurance industry.

873687v1/008877                                    - 2 -

A.   The efficient market hypothesis does not establish materiality of an alleged misrepresentation which has an insignificant impact on a company's total financial picture.

In *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410 (3d Cir. 1997), the Third Circuit held that a disclosure was **immaterial** as a matter of law if it did not affect the stock price. But the Third Circuit did not hold that a representation is material based solely on an allegation that the stock price declined after a disclosure. *Burlington* shows that even when plaintiffs have pled a drop in stock price in an efficient market, the court must determine whether the complaint "contain[s] claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." *Burlington*, 114 F.3d at 1426.

In *Burlington*, plaintiffs alleged that defendant Burlington (BCF) failed to make timely disclosure of various issues, which allegedly led to disappointment over results for fiscal-year 1994. After BCF announced the disappointing results, its stock price fell 30% in one day. *Id.* at 1414. Plaintiffs alleged that the disappointing results were due in part to BCF having received reduced discounts when it bought the bulk of its inventory of coats in early 1994. *Id.* at 1425-26. The Third Circuit held that even though the reduction in discounts contributed to the disappointing earnings, which in turn triggered a 30% stock drop, the reduction in discounts was immaterial as a matter of law.

> The impact was negligible; total costs between 1993 and 1994 increased only 0.2%, and many factors other than merchandise discounts go into total costs. Where the data alleged to have been omitted would have had no more than a negligible impact on a reasonable investor's prediction of the firm's future earnings, the data can be ruled immaterial as a matter of law.

*Id.* at 1427.

There are numerous cases that, like *Burlington*, establish that an alleged misrepresentation is immaterial if it is financially insignificant – even when the plaintiffs plead that the defendant's stock has dropped after a revelation or disclosure.

- *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539 (8th Cir. 1997). "In this case, the district court concluded, and we agree, that the Defendants' alleged overstatement of assets by $6.8 million was immaterial as a matter of law. Taken in context, this amount represented only 2% of Gateway's total assets." *Id.* at 547; *see also id.* at 544 (plaintiffs alleged that Gateway's stock price dropped from $20-7/16 to $9-1/4).

- *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204 (4th Cir. 1994). "The difference between the company's predicted income . . . and its delivered income . . . was only .5% of total revenues. This difference is hardly material." *Id.* at 219; *see id.* at 208 (plaintiffs alleged that stock price dropped to $4.25 from a high of $6.37 and an average of $5.09).

- *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707 (E.D. Va. 2003). "Regardless of how this Court measures Circuit City's 'total activity', the omission of the increased lease impairment costs was immaterial. The ten million dollar omission was 0.01 percent of Circuit City's $9.59 billion in total revenue for the fiscal year ending February 28, 2002." *Id.* at 720; *see also id.* at 712 (plaintiffs alleged a 33% drop in stock price).

As in the cases cited above, plaintiffs here have not alleged misrepresentations about financially significant issues. Plaintiffs' bid-rigging allegations concern isolated transactions predating the class period, which are not alleged to have any specific effect, significant or otherwise, on ACE's earnings or revenues. Complaint ¶ 34. And plaintiffs have not alleged that ACE had any net earnings from contingent commission arrangements. Because plaintiffs have not alleged the magnitude of earnings derived from the alleged schemes, the Court cannot assess the materiality of the alleged schemes to ACE's total financial picture. Since plaintiffs have an obligation to plead with particularity, the Court should dismiss their deficient complaint.

B.    <u>The efficient market hypothesis does not establish the materiality of an alleged misrepresentation which is not related to the revelation which preceded the stock drop.</u>

The Court cannot assess materiality merely by focusing on a drop in stock price. A drop in stock price measures, at most, the materiality of a disclosure or revelation. The Court must assess the materiality of the alleged **misrepresentation**, not the materiality of the disclosure or revelation (*i.e.*, an event) which led to drop in a stock's price. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341, 125 S. Ct. 1627, 1631 (2005) (one element of a § 10(b) claim is a "material misrepresentation (or omission)").

In order to be actionable, an alleged misrepresentation must be related to the disclosure that preceded the stock price drop. *Berckeley Investment Group, Ltd. v. Colkitt*, 455 F.3d 195, 223 (3d Cir. 2006) ("A plaintiff does not meet the loss causation element if he fails to prove that the drop in the value of a security is related to the alleged misrepresentation."). The vague representations alleged by plaintiffs – that ACE was "ideally positioned," was experiencing "rapid organic growth," etc. – are not related to the disclosures in the Spitzer complaint. Therefore, even if the efficient market hypothesis suggested that the Spitzer complaint was material, it could not establish the materiality of the alleged misrepresentations.

C.    <u>The efficient market hypothesis does not establish the materiality of an alleged misrepresentation which merely is a soft "positive portrayal" of the company.</u>

Because the Court must assess the materiality of the alleged misrepresentations, not just the materiality of the revelation which caused the stock drop, the Court must determine whether the alleged misrepresentation was "hard" information or soft puffery. "Soft, puffing statements . . . generally lack materiality because the market price of a share is not inflated by vague statements predicting growth." *Burlington*, 114 F.3d at 1425 (quoting *Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4th Cir.1993)). There is no material misrepresentation where, as here, a

company bathed itself in a favorable light while reporting accurate earnings figures, even if the

defendant later disclosed "that things are less rosy." *In re Advanta Corp. Secs. Litig.*, 180 F.3d

525, 538-39 (3d Cir. 1999). The company's "positive portrayals" during the class period cannot

be construed as material or false. *Id.*

When, as here, the plaintiffs allege soft misrepresentations in an efficient market, the

court must apply especially robust scrutiny to the materiality element of a § 10(b) claim.

> Scrutiny of vaguely optimistic statements is "especially robust" in cases involving
> a fraud-on-the-market theory of liability, such as this one, because the
> hypothetical "reasonable investor," by reference to whom materiality is gauged, is
> "the market" itself. . . . The market, as opposed to an individual investor, is not
> easily misled by the rosy forecasts commonly issued by corporate spokespersons.

*In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164-65 (N.D. Ill. 2004).

The *Galati* case demonstrates that a court must assess the materiality of the alleged

misrepresentations even when the plaintiff alleges a large stock drop occurring after a material

revelation about criminal conduct involving the defendant company. In *Galati v. Commerce

Bancorp, Inc.*, 2005 WL 3797764 (D.N.J. Nov. 7, 2005), plaintiffs sued Commerce Bancorp and

some of its officers and directors after the bank's stock dropped 23% in two days. *Galati*, 2005

WL 3797764 at *2. The stock drop followed the announcement that three Commerce Bank

executives and directors had been indicted for bribing a public official in exchange for contracts

and other official actions favoring Commerce Bank. *Id.* at *1. The public official allegedly

rigged bids on behalf of Commerce Bank. *Id.*

The district court concluded that Commerce Bank's alleged bribery and bid-rigging

would be material to a reasonable investor. *Id.* at *5. But that was not enough. The court

examined plaintiffs' theory of § 10(b) liability, which was nearly identical to the theory in the

instant case: "Defendants misleadingly attributed Commerce Bank's success to its unique

business model and convenience when its pattern of bribery and bid-rigging fueled the

Company's results." *Id.* at *2. The alleged misrepresentations were immaterial as a matter of law.

> These remarks are exactly the sort of vague, general, optimistic commentary that the Third Circuit has deemed immaterial puffery. Commerce Bank's slogan "America's Most Convenient Bank" and its claim to a "unique" business model are simply too vague and subjective to influence reasonable investors or "alter the total mix of information available." . . .

*Id.* at *5.

The plaintiffs in *Galati* also argued that Commerce Bank's reported earnings during the class period were materially misleading in light of Commerce Bank's nondisclosure of the risk attendant to the alleged criminal activities – an argument which plaintiffs make in the instant case. The district court rejected this argument:

> [W]hile omissions regarding criminal conduct are material, omissions relating to "the attendant risks" or unsustainability of criminal conduct are not. Even if a corporation is engaging in illegal practices, predictions of future events such as criminal indictments are too speculative to be material.

*Id.* at *6 (citing *Craftmatic*, 890 F.2d 628, 640-41, 644 (3d Cir. 1989)). The court went on to hold that, although the illegal conduct was material, there was no actionable misrepresentation, because "Defendants are liable under Rule 10b-5 for failure to disclose their illegal practices only if Plaintiffs can point to a statement that was rendered inaccurate or misleading by the omission." *Id.* Like the plaintiffs in the instant case, the plaintiffs in *Galati* pointed only to "vague positive remarks accompanying earnings releases" which could not support liability under Rule 10b-5. *Id.* at *7.

The Third Circuit affirmed the district court's ruling:

> "Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b)." *In re Advanta*, 180 F.3d at 538. Moreover, statements concerning the Company's "dramatic deposit growth," "strong performance," and "unique business model," constitute nothing more than mere "puffery," insufficient to sustain a Rule 10b-5 claim. *See id.* at 538-39. Indeed, none of the statements recited by plaintiffs "put into play" the integrity of Commerce Bank's practices with respect to government deposits. . . . Rather, as

the District Court concluded, the statements were routine recitations of past financial performance, and general optimistic statements about the Company's future growth that, in and of themselves, did not give rise to a duty to disclose the malfeasance of three senior officers employed by the Company's subsidiary.

*Galati v. Commerce Bancorp, Inc.*, 220 Fed. Appx. 97, 101-02 (3d Cir. 2007).

There are numerous cases that, consistent with *Galati*, illustrate the limits of the efficient market hypothesis in any assessment of materiality. In each of these cases, plaintiffs filed a securities fraud lawsuit after a drop in the defendant's stock price. In each of these cases, the courts held at the motion to dismiss stage that despite the stock drop, there was no material misrepresentation or omission.

- *Key Equity Investors Inc. v. Sel-Leb Marketing Inc.*, 246 Fed. Appx. 780 (3d Cir. 2007). Plaintiff Key Equity sued defendant Sel-Leb and others after Sel-Leb made disclosures about its financial health that "rendered the company's shares worthless." *Id.* at 783. Despite that dramatic market reaction to Sel-Leb's disclosures, Key Equity did not allege a material misrepresentation. "Almost all the statements identified by Key Equity were projections about the company's financial growth, or expressions of general optimism about its financial health." *Id.* at 785. Even in the face of Sel-Leb's stock value being wiped out, the case had to be dismissed because the alleged misrepresentations were immaterial puffery.

- *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000). Defendant AHP's stock fell about 9% over three days after AHP announced that it was withdrawing two of its fen-phen drugs from the market and was incurring losses and lawsuits as a result of concerns about fen-phen causing heart-valve abnormalities. *Id.* at 280. Plaintiffs alleged, among other things, that AHP was liable for failing to disclose during the class period the dates on which it learned of potential problems with fen-phen. Plaintiffs argued that this information would have helped inform investors about AHP's potential products liability exposure. *Id.* at 285. Plaintiffs argued that AHP's class-period disclosures about products liability exposure were incomplete and therefore misleading. *Id.* at 286. Like plaintiffs in the instant case, plaintiffs in *Oran* argued that the stock drop upon disclosure established materiality. *Id.* The Third Circuit agreed that the disclosure may have been material, but affirmed dismissal because the threat of product liability exposure was "purely speculative" prior to the FDA informing AHP that its data showed a link between fen-phen and heart valve disorders, and AHP's knowledge of prior studies was "immaterial as a matter of law." *Id.* at 286.

- *In re Sofamor Danek Group, Inc.*, 123 F.3d 394 (6th Cir. 1997). Defendant Sofamor Danek's stock price dropped by more than a third over two days after the company announced disappointing sales results apparently caused by safety concerns relating to Sofamor Danek's products. *Id.* at 399. Plaintiffs alleged that Sofamor Danek had fraudulently omitted to tell investors during the class period that its earnings were boosted by the company's improper marketing of its product for a purpose not approved by the FDA. *Id.* Like the plaintiffs in the instant case, plaintiffs alleged that Sofamor Danek made fraudulent statements about the reasons for its sales and earnings growth during the class period and omitted information about its purportedly illegal activities. *Id.* at 401. The court held that plaintiffs could not base a securities fraud lawsuit on "soft" information, such as predictions and matters of opinion. *Id.* at 402. The court specifically noted that the legality of Sofamor Danek's activities was a matter of opinion and therefore not actionable. *Id.*

D. <u>The efficient market hypothesis did not salvage plaintiffs' allegations in other cases involving contingent commissions and/or bid rigging in the insurance industry.</u>

In analyzing whether plaintiffs have alleged a material misrepresentation relating to contingent commissions and bid rigging in the insurance industry, the Court is not treading on new ground. Other courts have concluded that plaintiffs failed to allege material misrepresentations, even though plaintiffs had alleged a stock drop in connection with revelations about contingent commissions and bid rigging in the insurance industry.

1. *Marsh*

On the day Spitzer sued Marsh, Marsh's stock price plummeted from $46.13 to $34.85. *In re Marsh & McLennan Cos., Inc. Secs. Litig.*, 501 F. Supp. 2d 452, 464 (S.D.N.Y. 2006) It fell to $29.20 the following day. *Id.* Plaintiffs sued Marsh & McLennan Companies, Inc. ("MMC"), its subsidiary Marsh Inc., its auditor, and various directors and officers of Marsh for securities fraud. *Id.* at 459.

The court first assessed materiality. Unlike plaintiffs in the instant case, the plaintiffs in the Marsh case identified the defendant's revenues and profits from contingent commission

arrangements. *Id.* at 468. Because those revenues and profits were substantial, the court concluded that the undisclosed misconduct was material. *Id.* at 468-69.

Despite the court's conclusion that the undisclosed misconduct was material, the court concluded that most of the alleged misrepresentations were not actionable. *Id.* at 469 ("Simply alleging the nondisclosure of material information . . . is insufficient to state an actionable misrepresentation absent a clear duty to disclose.").

Like the plaintiffs here, the plaintiffs in the *Marsh* case alleged that Marsh "misstated its earnings merely by failing to disclose the misconduct." *Id.* Even though the plaintiffs in *Marsh*, unlike the plaintiffs here, could identify the amount of earnings attributable to the alleged misconduct, *id.* at 468, the alleged misstatement of earnings was not actionable. "Absent an allegation that MMC reported income that it did not actually receive, the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability." *Id.* at 470. In neither the *Marsh* case nor the *ACE* case have the plaintiffs alleged that the defendants reported income that they did not actually receive. As with ACE, "there was no restatement of earnings or external investigation of MMC's accounting practices. Plaintiffs do not allege that MMC harbored non-existent assets on its books, made undisclosed payments, improperly recognized revenue, or engaged in sham transactions creating the illusion of revenue." *Id.* at 477.

Like the plaintiffs here, the plaintiffs in *Marsh* also alleged that the defendants failed to disclose the risks associated with the alleged misconduct. *Id.* at 471. The court stated that Marsh was not obligated to make disclosures predicting litigation absent an allegation that the litigation was substantially certain to occur during the relevant period. *Id.* The court held that plaintiffs did not adequately allege that Marsh was likely to be subject to litigation. *Id.* As the litigation

risk proved to be substantially less for ACE, which was never sued by the NYAG, the *Marsh* court's holding should be dispositive in this case.

Like the plaintiffs here, the plaintiffs in *Marsh* alleged "that MMC misstated its earnings during the Class Period by failing to reserve for contingent losses stemming from Marsh's improper steering and bid manipulation." *Id.* The court rejected this argument: "Considering the longstanding industry practice of collecting contingent commissions, the lack of regulatory scrutiny during the Class Period, and the turnover in management prior to the settlement, the Complaint does not adequately allege that MMC should have reported a *probability* of litigation losses with respect to their collection of contingent commissions." *Id.* at 472. The court noted that "the allegations of the Complaint are insufficient to explain how MMC could have reasonably estimated and accrued the loss amount at the time the financial statements were issued or at any time prior to settlement negotiations." *Id.* These holdings are directly applicable to plaintiffs' claims that ACE should have somehow anticipated litigation and reserved for some amount of future liability.

Unlike ACE, Marsh made some representations during the class period relating to contingent commissions. Specifically, Marsh alleged that it received contingent commissions in return for various services which it provided to insurers. Plaintiffs adequately alleged that these representations were false. *Id.* at 473-75. Plaintiffs also adequately alleged that Marsh made material misrepresentations about how it makes insurance placements and about the extent of its disclosures to clients about contingent commissions. *Id.* at 475-76. Of course, the plaintiffs here have alleged no such representations. *See In re AXIS Capital Holdings Ltd., Secs. Litig.*, 456 F. Supp. 2d 576, 588 (S.D.N.Y. 2006) (distinguishing securities claim against an insurer from the actionable misrepresentations in *Marsh*: "plaintiffs point to no comparable description by AXIS of services provided or received for contingent commissions that was thereby rendered

misleading. This is not in itself surprising as AXIS is not in the business of providing brokerage services."). The types of representations alleged by the plaintiffs here are more like certain other representations which the *Marsh* court found not to be actionable – that Marsh had a "culture of excellence," was "dedicated to client service," etc. *Marsh*, 501 F. Supp. 2d at 475.

       2.    *HRH*

In *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571 (E.D. Va. 2006), the plaintiff alleged that HRH, an insurance broker, committed securities fraud by failing to disclose that (1) non-standard (i.e., contingent) commissions from insurers constituted nearly 40% of its income, (2) its agreements with three large insurers were designed to secretly limit competition by steering business to the preferred insurers, and (3) its strategy created a risk of fines, penalties, claims for restitution, and damages. *Id.* at 576, 580. The plaintiff alleged that disclosure of these facts led to a decline in HRH's stock price. *See* Exhibit 1 (HRH Complaint) at ¶¶ 155, 164, 168, 174.

Like the plaintiffs here, the plaintiff in *HRH* asserted that the defendant's financial statements were false and misleading because they were not accompanied by disclosures relating to contingent commissions. *HRH*, 432 F. Supp. 2d at 582. Like the *Marsh* court, the *HRH* court held that the plaintiffs could not complain about a supposed lack of disclosures accompanying the defendant's accurately-reported earnings. *Id.*

Like the court in *Marsh*, the court in *HRH* rejected the plaintiff's attempt to plead inadequate reserves. Like the plaintiffs here, the plaintiff in *HRH* failed to "plead facts indicating when, during the Class Period, there was a reasonable possibility that an additional loss may have been incurred, or when such a loss was probable or reasonably estimable, therefore requiring the establishment of a loss reserve." *Id.* As in the instant case, this conclusion was bolstered by the fact that "under the scrutiny of industry regulators, HRH has not

restated its earnings during the Class Period and neither the SEC nor any other entity has called

for a restatement." *Id.* at 588. Moreover, like the plaintiffs here, the plaintiff in *HRH* failed to

adequately allege the amount that should have been reserved. *Id.*

Even though the plaintiff had alleged a stock drop in connection with the revelation of

HRH's practices, the court found that the plaintiff had not adequately alleged materiality.

> While pending litigation may be material under certain circumstances, the mere
> possibility of litigation is not material. . . . Here, Plaintiff pleads no facts
> suggesting that the risks of litigation, loss of customers, and disgorgement, were
> substantially likely to occur. ***Instead, Plaintiff asks the Court to infer from the
> recent occurrences in the insurance industry concerning steering agreements
> and non-standard commissions that HRH must have expected these
> occurrences would arise during the Class Period. The Court refuses to make
> such an inference because mere allegations amounting to fraud by hindsight
> are insufficient.***

*Id.* (emphasis added).

**2.    Should the efficient market hypothesis be revisited in light of the PSLRA?**

*See* Response to Question 3.

**3.    Has application of the efficient market hypothesis been questioned by any court or
commentator?**

Courts and commentators have observed that the PSLRA evinces a Congressional

skepticism of the efficient market hypothesis. *Unger v. Amedisys, Inc.*, 2003 WL 25739165, at

*6 (M.D. La. Aug. 1, 2003) ("when Congress strengthened the pleading requirements and limited

damages in securities actions by enacting the Private Securities Litigation Reform Act

('PSLRA'), it codified the very same loss-causation requirement that was diminished by the

*Basic* Court as part of a double presumption and apparently rejected the 'efficient markets

hypothesis' as a descriptive theory of the securities marketplace."), *rev'd on other grounds*, 401

F.3d 316 (5th Cir. 2005); Jeffrey L. Oldham, *Taking "Efficient Markets" Out of the Fraud-on-

the-Market Doctrine After the Private Securities Litigation Reform Act*, 97 Nw. U. L. REV. 995,

998 (2003) ("the text and policies of the PSLRA hold powerful implications for *Basic*'s

underlying justification for the fraud-on-the-market presumption and render precarious the subsequent lower court implementation of *Basic*."); Nathaniel Carden, *Implications of the Private Securities Litigation Reform Act of 1995 for Judicial Presumptions of Market Efficiency*, 65 U. CHI. L. REV. 879 (1998) ("the PSLRA provides evidence of congressional distrust" of the efficient capital markets hypothesis).

The PSLRA's 90-day look-back provision, 15 U.S.C. § 78u-4(e), provides that damages cannot be calculated solely by looking at the drop in stock price immediately following a disclosure; damages are sharply limited where, as here, the stock price rebounds in the 90 days after the disclosure. This provision suggests that the stock market's immediate reaction to a disclosure is not always an accurate measure of the materiality of the disclosure. Carden, *supra* ("Through this provision the PSLRA provides for a 'look-back' period following the corrective disclosure so that plaintiffs will not be overcompensated if the markets overreact to a disclosure correcting the initial misleading statement or omission.").

4.      **Can a court, at the motion to dismiss stage, assess the allegations of the financial impact of the alleged fraud against the company's total financial picture?**

*See* Response to Question 5.

5.      **If the amounts involved in the contingent commissions and bid-rigging schemes are insignificant, are they material?**

As discussed in response to Question One, the Third Circuit in *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997), found that the impact of an alleged fraud was "negligible," and so affirmed the district court's order granting a motion to dismiss. Many other cases have held that an alleged misrepresentation is immaterial as a matter of law even though plaintiffs pled a stock drop. As discussed in § 1(A) above, plaintiffs have not adequately pled that the alleged schemes had any significant financial effect. As a result, under *Burlington* and other cases, plaintiffs have not adequately alleged materiality.

6.     **What is the economic loss if the stock price rebounded within six weeks?**

As shown in the Yahoo Finance print-out attached as Exhibit 2 to this brief, ACE Limited's stock price did rebound within six weeks. Plaintiffs will assert that the economic loss results from the initial decline in the stock price. But the decline in the stock price does not establish the existence of a compensable loss, much less a loss caused by an actionable material misrepresentation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342-43, 125 S. Ct. 1627, 1632 (2005) ("When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."). Moreover, any economic loss will be sharply limited by the provisions of 15 U.S.C. § 78u-4(e), as discussed in response to Question Thirteen below.

7.     **How is the $500,000 advance to Willis fraudulent?**

It isn't.

Plaintiffs allege that "ACE agreed to advance Willis $500,000 for unearned payments allowing *Willis* to boost its financial performance in 2003." Complaint ¶ 28. Plaintiffs do not allege that the advance boosted *ACE's* financial performance. Plaintiffs do not allege that ACE made any public disclosure – misleading or otherwise – about this advance. Plaintiffs do not allege that this transaction is material.

Plaintiffs do not – and cannot – allege that the Willis transaction was disclosed in October 2004. Therefore, they cannot allege that the stock drop in October 2004 had anything to do with that transaction. And since the plaintiffs do not allege that ACE's stock price dropped after disclosure of the Willis transaction, there is no loss causation with respect to that

transaction. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346-47, 125 S. Ct. 1627, 1634 (2005) (it is not sufficient merely to allege that a misrepresentation inflated purchase price).

**8.   Is the loss causation element satisfied when there is a drop in stock price on the basis of allegations of wrongdoing that soon proved insignificant or without foundation?**

No.

Loss causation is "a causal connection between the material misrepresentation and the loss." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007). "The loss causation element requires the plaintiff to prove 'that it was ***the very facts*** about which the defendant lied which caused its injuries.'" *Id.* at 431 (emphasis added) (quoting *Berckeley Investment Group, Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006)). The plaintiff must show "that the revelation of that misrepresentation or omission was a substantial factor in creating a decline in the security's price, thus creating an actual economic loss for the plaintiff." *Id.* at 425-26.

When an insignificant or groundless allegation of wrongdoing is disclosed, any resulting loss is caused by the market's reaction to the groundless allegation of wrongdoing – not by the non-disclosure of the groundless allegation. Defendants are not required to disclose corporate misconduct – let alone groundless allegations of corporate misconduct.

The NYAG's allegations of wrongdoing did prove to be insignificant or without foundation. Earlier this year, the New York Supreme Court, Appellate Division, held that the NYAG could not pursue claims against an insurer based on its payment of contingent commissions. In dismissing in part claims which the NYAG had brought against Liberty Mutual Insurance Company, the Appellate Division held that "contingent commission agreements between brokers and insurers are not illegal, and in the absence of a special relationship between the parties, defendant[s] had no duty to disclose the existence of the contingent commission agreement." *People v. Liberty Mutual Ins. Co.*, 861 N.Y.S.2d 294, 295 (App. Div. 2008)

(quoting *Hersch v. DeWitt Stern Group, Inc.*, 841 N.Y.S.2d 516 (App. Div. 2007)).  Several courts have confirmed in securities actions that contingent commissions were a long-standing and legal practice in the insurance industry.  *In re Marsh & McLennan Companies, Inc. Secs. Litig.*, 501 F. Supp. 2d 452, 472 (S.D.N.Y. 2006); *In re AXIS Capital Holdings, Ltd., Secs. Litig.*, 456 F. Supp. 2d 576, 580, 581, 592 (S.D.N.Y. 2006); *Staehr v. The Hartford Fin. Servs. Group, Inc.*, 460 F. Supp. 2d 329, 337-40 (D. Conn. 2006) (all describing the long-standing and legal practice of paying contingent commissions).  And the decisions in *In re Insurance Antitrust Litigation* belie the NYAG's allegations of a conspiracy among insurers and brokers.  *See In re AXIS Capital Holdings, Ltd. Secs. Litig.*, 456 F. Supp. 2d 576, 586 (S.D.N.Y. 2006) (relying on opinion in *In re Insurance Brokerage Antitrust Litigation* to hold that securities plaintiffs had failed to allege a scheme in violation of federal antitrust laws).

Plaintiffs cannot show loss causation with respect to their allegation of overstated reserves.  The private antitrust litigation proved to be without foundation, since it was dismissed without ACE having to pay anything to private plaintiffs.  Although ACE in 2006 did establish a restitution fund for certain policyholders through a settlement with the New York Attorney General and certain other state agencies, plaintiffs as a matter of law have not adequately alleged how ACE "could have reasonably estimated and accrued the loss amount at the time the financial statements were issued or at any time prior to settlement negotiations."  *In re Marsh & McLennan Companies, Inc. Secs. Litig.*, 501 F. Supp. 2d 452, 472 (S.D.N.Y. 2006) (Marsh could not be held liable under the securities laws for its failure to accrue earlier for its restitution fund with the New York Attorney General).  Plaintiffs therefore cannot show that a material misstatement of reserves caused the temporary drop in stock price in October 2004.

Plaintiffs also cannot show that the stock drop was caused by a material misrepresentation of the source of ACE's earnings.  The Spitzer complaint says nothing about

whether the alleged bid-rigging scheme or ACE's payment of contingent commissions had any effect on ACE's earnings. "A plaintiff does not meet the loss causation element if he fails to prove that the drop in the value of a security is related to the alleged misrepresentation." *Berckeley Investment Group, Ltd. v. Colkitt*, 455 F.3d 195, 223 (3d Cir. 2006); *see PEC Solutions, Inc. Secs. Litig.*, 2004 WL 1854202, at *11 (E.D. Va. May 25, 2004) (despite stock drop of more than 40%, plaintiffs did not allege loss causation where "Plaintiffs never mention how the Defendants' alleged misrepresentations led to the fall of the stock price"), *aff'd*, 418 F.3d 379 (4th Cir. 2005). To this day, ACE has not had to restate its earnings during the class period, and the case law is clear that a defendant cannot be held liable for its accurate financial reporting. *In re Advanta Corp. Secs. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) ("Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b).").

9.  **Has the *Tellabs* decision affected the application or the viability of the efficient market theory?**

No. *Tellabs* is relevant to the pleading requirements for scienter, not the reliance or materiality elements as to which the efficient market hypothesis is sometimes relevant. *Tellabs* shows that plaintiffs' scienter allegations are deficient as to ACE and the individual defendants.

The Court in *Tellabs* examined the PSLRA's requirement that a securities-fraud plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Court rejected the Seventh Circuit's formulation that a "strong inference" is pled by alleging facts from which, if true, a reasonable person could infer that the defendant acted with the required intent. *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504 (2007). The standard laid out by the Supreme Court is extraordinarily rigorous:

> [T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court . . . must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, as the Seventh Circuit did, *but also competing inferences rationally drawn from the facts alleged.* An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as "strong" within the intendment of § 21D(b)(2) [of the PSLRA], we hold, an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

*Id.* at 2504-05.

The Court went on to hold that "to determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, *a court must consider plausible nonculpable explanations for the defendant's conduct*, as well as inferences favoring the plaintiff." *Id.* at 2510. "A plaintiff alleging fraud in a § 10(b) action . . . must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference." *Id.* at 2513. Any "omissions and ambiguities" in plaintiff's complaint "count against inferring scienter." *Id.* at 2511.

According to the Third Circuit, *Tellabs* "dictates a more stringent standard than probable cause." *Winer Family Trust v. Queen*, 503 F.3d 319, 329 n.3 (3d Cir. 2007).

Plaintiffs omit any particular allegations showing that the individual defendants knew about the isolated examples of allegedly improper bidding activity. This omission counts against inferring scienter. *Tellabs*, 127 S. Ct. at 2511. The Court must consider the plausible non-culpable explanation that defendants simply did not know about the allegedly improper bidding. Because that explanation is more plausible than the inference of scienter, plaintiffs have failed to meet the *Tellabs* standard. *See In re Marsh & McLennan Cos., Inc. Secs. Litig.*, 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006) ("simply arguing that specific high level employees must have known what was taking place at Marsh because certain subordinate employees were later implicated in

the fraud is insufficient to give rise to the strong inference of scienter required to state a claim under Section 10(b).").

The most plausible inference with respect to contingent commissions is that defendants viewed them as a legal and acceptable practice. Three courts have held that plaintiffs could not plead scienter with respect to contingent commissions because they were a legal and widespread practice:

- In *In re AXIS Capital Holdings Ltd., Secs. Litig.*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006), the court could not draw a strong inference of scienter because contingent commissions were a widespread, legal practice. "But surely this open use of incentive [i.e., contingent commission] agreements in the insurance industry renders implausible any inference that AXIS or its managers knew that the agreements were illegal or, more to the point, knew that the disclosures that are the subject of the complaint were likely fraudulent." *Axis*, 456 F. Supp. at 592.

- In *In re Marsh & McLennan Cos., Inc. Secs. Litig.*, 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006), the court held that mere allegations that defendants knew about contingent commission agreements did not suffice to allege scienter.

- In *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571 (E.D. Va. 2006), the court found that plaintiffs had not pled a strong inference of scienter. "Here, Plaintiff fails to allege how each Individual Defendant acted with an intent to deceive investors. The Complaint fails to allege that any Individual Defendant believed or was advised that HRH faced regulatory problems but told investors otherwise." *HRH*, 432 F. Supp. 2d at 592-93.

*AXIS*, *Marsh*, and *HRH* all predated the *Tellabs* decision. *Tellabs* makes it even more clear that plaintiffs here cannot allege scienter. *See Winer Family Trust v. Queen*, 503 F.3d 319, 326-34 (3d Cir. 2007) (applying *Tellabs* to affirm district court opinion that plaintiffs had not adequately alleged scienter).

**10.    What facts, if any, can the plaintiffs add in an amended complaint relating to the elements of scienter, loss causation and economic GAAP violations?**

Any proposed amendment by plaintiffs must be strictly scrutinized.

> Fed.R.Civ.P. 15(a) provides that leave to amend "shall be freely given" by the court "when justice so requires." We have previously acknowledged and discussed the PSLRA's unique impact of narrowing application of this standard in securities fraud cases. Allowing leave to amend where "'there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced, which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA,'" would frustrate Congress's objective in enacting this statute of "'provid[ing] a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis.'" *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 246 (3d Cir.2004) (quoting *In re NAHC*, 306 F.3d at 1332, 1333).

*California Public Employees' Retirement System v. The Chubb Corp.*, 394 F.3d 126, 164 (3d Cir. 2004). Defendants are aware of no facts that would meet this test, and therefore do not believe that plaintiffs should be permitted to re-plead after dismissal.

## 11. Can a court consider pre- and/or post-class period admissions/proofs about the schemes?

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). But the court can consider documents "integral to or explicitly relied upon in the complaint," *id.*, as well as matters of public record, *Lun v. Bank of America*, 361 F.3d 217, 221 n.3 (3d Cir. 2004); *see, e.g.*, *AXIS Capital Holdings Ltd., Secs. Litig.*, 456 F. Supp. 2d 576, 580, 581 (S.D.N.Y. 2006) (considering pre-class period information showing payment of contingent commissions to be a long-standing legal practice); *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 581 (E.D. Va. 2006) (considering publicly available analyst reports predating the class period in concluding that there was no actionable omission during the class period).

Under *Tellabs*, the Court can credit allegations about events predating the class period only to the extent that they render an inference of scienter at least as likely as any plausible opposing inference. The only specific allegations about "B" quotes predate the class period. Complaint ¶ 34. The allegations suggest that ACE executives addressed concerns about "B"

quotes early in the class period, Complaint ¶ 32, and the NYAG was apparently unable to offer any specific allegations about ACE participating in B quoting or other similar activities after the beginning of the class period. *Compare* Exhibit H at ¶¶ 53-55 (describing allegedly improper bidding activity in late 2002 and the first half of 2003) *with id.* at ¶ 56 (conclusorily stating that ACE provided inflated quotes in 2004). Even if the Court considers plaintiffs' allegations of wrongful conduct prior to the class period, the most plausible inference is that this conduct did not continue during the class period.

12.    **Can the class be limited to those who purchased and sold shares during the class period?**

Any putative class should be limited to persons who both 1) purchased shares during the class period and 2) did not sell those shares during the class period.

Any putative class should be limited to those who <u>purchased</u> shares during the putative class period. This is because, under plaintiffs' theory of the case, any person who purchased shares before the commencement of the class period would have purchased shares prior to the first alleged material misrepresentation – and, thus, at a non-inflated price.

Any putative class should also be limited to those who <u>did not sell</u> during the putative class period. This is because, under plaintiffs' theory of the case, any putative class member who purchased shares during the class period but also <u>sold</u> those shares during the class period would not have damages since any purported fraud-related loss occurred only after Mr. Spitzer sued Marsh on the morning of October 14, 2004.

13.    **Does 15 U.S.C. § 78u-4(e), which governs limitations on damages, affect the maximum amount of damages the plaintiffs can recover?**

Yes. 15 U.S.C. § 78u-4(e) limits a plaintiff's damages to the difference between the price paid and a "mean trading price" for a defined period following the alleged corrective disclosure. This provision limits damages for all members of the class. Because ACE's stock price

recovered quickly, many members of the alleged class will not be able to recover any damages at all. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 461 (9th Cir. 2000) ("if the mean trading price of a security during the [relevant period] following the correction is *greater* than the price at which the plaintiff purchased his stock then that plaintiff would recover nothing under the PSLRA's limitation on damages.").

Respectfully submitted,

/s/ Stephen A. Cozen
Stephen A. Cozen
George M. Gowen III
COZEN O'CONNOR
1900 Market Street
Philadelphia, Pennsylvania 19103
(215) 665-2020

H. Lee Godfrey
Neal S. Manne
Johnny W. Carter
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
(713) 651-9366

Jeremy Brandon
SUSMAN GODFREY LLP
901 Main Street, Suite 5100
Dallas, Texas 75202-3775
(214) 754-1900

*Attorneys for Defendants ACE Limited, Evan G. Greenberg, Brian Duperreault, and Philip V. Bancroft*