UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

In re ACE LIMITED SECURITIES
LITIGATION

)
)
)
)

MDL No. 1675

<u>CLASS ACTION</u>

PLAINTIFFS' RESPONSE TO THE
COURT'S OCTOBER 16, 2008 ORDER
AND IN FURTHER SUPPORT OF THE
OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS THE CONSOLIDATED
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

Question 1:  Is the efficient market hypothesis always a reliable indicia of
materiality? ............................................................................................................1

Question 2:  Should the efficient market hypothesis be revisited in light of the
PSLRA? ..................................................................................................................2

Question 3:  Has application of the efficient market hypothesis been questioned
by any court or commentator? ...............................................................................3

Question 4:  Can a court, at the motion to dismiss stage, assess the allegations of
the financial impact of the alleged fraud against the company's total
financial picture?...................................................................................................3

Question 5:  If the amounts involved in the contingent commissions and bid-
rigging schemes are insignificant, are they material?...........................................5

Question 6:  What is the economic loss if the stock price rebounded within six
weeks?....................................................................................................................6

Question 7:  How is the $500,000 advance to Willis fraudulent? ......................................8

Question 8:  Is the loss causation element satisfied when there is a drop in stock
price on the basis of allegations of wrongdoing that soon proved
insignificant or without foundation?.....................................................................9

Question 9:  Has the *Tellabs* decision affected the application or the viability of
the efficient market theory? ................................................................................11

Question 10:  What facts, if any, can the plaintiffs add in an amended complaint
relating to the elements of scienter, loss causation and economic GAAP
violations?............................................................................................................11

Question 11:  Can a court consider pre- and/or post-class period
admissions/proofs about the schemes? ................................................................13

Question 12:  Can the class be limited to those who purchased and sold shares
during the class period? ......................................................................................15

Question 13:  Does 15 U.S.C. §78u-4(e), which governs limitations on damages,
affect the maximum amount of damages the plaintiffs can recover? ...................15

# TABLE OF AUTHORITIES

**Page**

## CASES

*Aviva Partners LLC v. Exide Techs.*,
No. 05-3098 (MLC), 2007 U.S. Dist. LEXIS 17347
(D.N.J. Mar. 13, 2007)................................................................................14

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)................................................................1, 2, 3, 11

*Berckeley Inv. Group, Ltd. v. Colkitt*,
455 F.3d 195 (3d Cir. 2006)........................................................9

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)..............................................................9, 12

*Galati v. Commerce Bancorp, Inc.*,
No. 04-3252, 2005 U.S. Dist. LEXIS 26851
(D.N.J. Nov. 7, 2005)................................................................6

*Glover v. DeLuca, et al.*,
No. 2:03-CV-0288, 2006 U.S. Dist. LEXIS 76093
(W.D. Pa. Sept. 29, 2006)...........................................................14

*Greebel v. FTP Software, Inc.*,
194 F.3d 185 (1st Cir. 1999)........................................................13

*GSC Partners v. Washington*,
368 F.3d 228 (3d Cir. 2004)........................................................12

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)........................................................1, 2, 4

*In re Comverse Tech., Inc.*,
No. 06 CV 1825 NGG RER, 2006 WL 2792757
(E.D.N.Y. Sept. 27, 2006)...........................................................10

*In re DVI Inc. Sec. Litig.*,
249 F.R.D. 196 (E.D. Pa. 2008)....................................................13

*In re Merck & Co., Inc. Sec. Derivative & ERISA Litig.*,
No. 07-2431, 2008 U.S. App. LEXIS 19230
(3d Cir. Sept. 9, 2008)...............................................................3

*In re Merck & Co. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005)........................................................3, 5, 13, 14

**Page**

*In re Res. Am. Sec. Litig.*,
    202 F.R.D. 177 (E.D. Pa. 2001)................................................................2

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)................................................................14

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006)................................................................12

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996)................................................................1, 3

*Marsden v. Select Med. Corp.*,
    No. 04-4020, 2007 WL 1725204
    (E.D. Pa. June 12, 2007)................................................................9

*Nathenson v. Zonagen, Inc.*,
    267 F.3d 400 (5th Cir. 2001) ................................................................13

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)................................................................14

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)................................................................1, 3, 10, 13

*Peil v. Speiser*,
    806 F.2d 1154 (3d Cir. 1986)................................................................2

*Pinker v. Roche Holdings, Ltd.*,
    292 F.3d 361 (3d Cir. 2002)................................................................3

*Register v. PNC Fin. Servs. Group, Inc.*,
    477 F.3d 56 (3d Cir. 2007)................................................................10

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
    No. 94 Civ 5587 (PKL) (RLE), 2002 U.S. Dist. LEXIS 23829
    (S.D.N.Y. Dec. 11, 2002)................................................................13

*Roeder v. Alpha Indus.*,
    814 F.2d 22 (1st Cir. 1987)................................................................6, 8

*Semerenko v. Cendant Corp.*,
    223 F.3d 165 (3d Cir. 2000)................................................................4

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    __ U.S. __, 128 S. Ct. 761 (2008)................................................................2

**Page**

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
__ U.S. __, 127 S. Ct. 2499 (2007)...................................................................10, 11, 12

*TSC Indus. v. Northway, Inc.*,
426 U.S. 438 (1976)................................................................................................1, 4

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
§78u-4(e)..............................................................................................................6, 7, 15

Federal Rules of Civil Procedure
Rule 8(a)(2)....................................................................................................................9
Rule 9(b)................................................................................................................11, 13
Rule 12(b)(6)................................................................................................................10

Federal Rules of Evidence
Rule 201.......................................................................................................................10

17 C.F.R.
§240.10b-5......................................................................................................................6

Request for Comments, Subcommittee Reports of the SEC Advisory
Committee on Improvements to Financial Reporting
73 Fed. Reg. 29808 (May 22, 2008) ...........................................................................4

## SECONDARY AUTHORITIES

Nathaniel Carden, Comment: *Implications of the Private Securities Litigation Reform
Act of 1995 for Judicial Presumptions of Market Efficiency*
65 U. Chi. L. Rev. 879 (1998) .....................................................................................3

Lead Plaintiffs, the Sheet Metal Workers' National Pension Fund and Alaska Ironworkers

Pension Trust ("Plaintiffs"), on behalf of ACE Limited investors, respectfully submit this response

to the Court's October 16, 2008 Order and in further support of the Opposition to Defendants'

Motion to Dismiss the Consolidated Complaint for Violations of the Federal Securities Laws.[1]

**Question 1:  Is the efficient market hypothesis always a reliable indicia of materiality?**

Yes, investor reaction to the disclosure of information is a reliable indicia of materiality.  In

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997), the Third Circuit set a

standard for measuring the materiality of statements or omissions in the context of an efficient

securities market.[2]  In an efficient market, such as the New York Stock Exchange on which ACE

traded, "information important to reasonable investors . . . is immediately incorporated into stock

prices." *Burlington*, 114 F.3d at 1425.  As a result, "when a stock is traded in an efficient market,

the materiality of disclosed information may be measured post hoc by looking to the movement, in

the period immediately following disclosure, of the price of the firm's stock." *Oran v. Stafford*, 226

F.3d 275, 282 (3d Cir. 2000).  Conversely, "to the extent that information is not important to

reasonable investors, it follows that its release will have negligible effect on the stock price."

*Burlington*, 114 F. 3d at 1425.

In this case, ACE's stock price dropped $3.78 per share on October 14, 2004 and $7.05 per

share over four trading days – an 18% decline on extremely high trading volume – in response to

---

[1]    Defendants are ACE Limited ("ACE" or the "Company") and the Company's senior officers who directed and approved the fraud, Evan G. Greenberg, Brian Duperreault and Philip V. Bancroft

[2]    A fact or omission is material if there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (adopting standard set forth in *TSC Indus. v. Northway, Inc.*, 426 U.S. 438 (1976)).  *See also In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 (3d Cir. 1996) (material information is information that would be important to a reasonable investor in making her investment decision).  Unless otherwise indicated, all internal citations are omitted.

news about ACE's "'sordid business practices'" involving contingent commission and bid-rigging schemes. *See* Consolidated Complaint, ¶¶67-68, 104-105 (Docket No. 5). The substantial reduction in ACE's stock price immediately following the disclosures about the contingent commission and bid-rigging schemes evidences the materiality of those schemes and Defendants' false statements and omissions about ACE's business practices and results.

**Question 2:  Should the efficient market hypothesis be revisited in light of the PSLRA?**

No, the validity of the efficient market hypothesis and the Supreme Court's holding in *Basic* were not impugned by the Private Securities Litigation Reform Act of 1995 ("PSLRA") or courts interpreting the PSLRA. The efficient market hypothesis, as adopted by the Supreme Court in *Basic* and by the Third Circuit in *Peil v. Speiser*, 806 F.2d 1154, 1161 (3d Cir. 1986), simply holds that "publicly available information is reflected in [the] market price" of a security. *Basic*, 485 U.S. at 247; *see also Burlington*, 114 F.3d at 1425 (an efficient market is one in which "information important to reasonable investors (in effect, the market . . .) is immediately incorporated into stock prices").[3]

Nothing in the PSLRA invalidated or questioned the use of the efficient market hypothesis, or the related fraud-on-the- market presumption, in securities fraud class actions. Indeed, just this year the Supreme Court, in *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, __ U.S. __, 128 S. Ct. 761 (2008), reconfirmed in a securities fraud class action that "reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the

---

[3]    There are three versions of the efficient market hypothesis. The strong form of the hypothesis states that stock prices reflect all public and private information. The semi-strong form of the efficient market hypothesis holds that stock prices reflect all publicly available information. The weak form of the hypothesis states that historical price data is fully reflected in stock prices. For purposes of securities fraud claims, the Supreme Court in *Basic* and the Third Circuit have adopted the semi-strong form of market efficiency. *See In re Res. Am. Sec. Litig.*, 202 F.R.D. 177, 189-90 (E.D. Pa. 2001).

security." *Id.* at 769 (*citing Basic*, 485 U.S. at 247).  Following the adoption of the PSLRA, the Third Circuit has also repeatedly endorsed the efficient market hypothesis. *See, e.g.*, *Oran*, 226 F.3d at 282; *In re Merck & Co., Inc. Sec. Derivative & ERISA Litig.*, No. 07-2431, 2008 U.S. App. LEXIS 19230, at *45 (3d Cir. Sept. 9, 2008); *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 373-74 (3d Cir. 2002).  As the Third Circuit remarked in its post-PSLRA decision in *Merck*, "[o]ur Court . . . has one of the 'clearest commitments' to the efficient market hypothesis." *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005).

**Question 3:  Has application of the efficient market hypothesis been questioned by any court or commentator?**

Yes, Plaintiffs' counsel are aware that certain attorneys for corporate defendants and associated commentators have, both before and after passage of the PSLRA, occasionally questioned the efficient market hypothesis.  *See, e.g.,* Nathaniel Carden, Comment: *Implications of the Private Securities Litigation Reform Act of 1995 for Judicial Presumptions of Market Efficiency*, 65 U. Chi. L. Rev. 879, 898 (1998) (arguing that "courts should be reluctant to use the [efficient market hypothesis] as the foundation for analyzing securities actions, because they lack the institutional competence to make such judgments").  As discussed in response to Question 2, however, in enacting the PSLRA Congress chose not to invalidate the presumption of fraud-on-the-market and the Supreme Court, as well as the Third Circuit and every other Circuit Court of Appeal, has continued to rely on the efficient market hypothesis in securities fraud actions.

**Question 4:  Can a court, at the motion to dismiss stage, assess the allegations of the financial impact of the alleged fraud against the company's total financial picture?**

Historically, one of many means to assess the materiality of an alleged misstatement or omission was whether the omitted or misstated information would impact 5% of net income.  This purported rule-of-thumb has, however, been rejected by both courts and accounting guidelines.  *See, e.g., Westinghouse*, 90 F.3d at 714 n.14 (rejecting "defendants' similarly categorical assertion that materiality must be quantified at a specified percentage of income or assets"); Securities and

- 3 -

Exchange Staff Accounting Bulletin No. 99 ("SAB 99") on materiality (recognizing that a 5% rule "cannot appropriately be used as a substitute for a full analysis of all relevant considerations," confirming that "[q]ualitative factors may cause misstatements of quantitatively small amounts to be material" and adopting the Supreme Court's holding that "[a] matter is "material" if there is a substantial likelihood that a reasonable person would consider it important"); *see also* Request for Comments, Subcommittee Reports of the SEC Advisory Committee on Improvements to Financial Reporting, 73 Fed. Reg. 29808, 29819-20 (May 22, 2008) (noting that a bright-line 5% rule is "not consistent with the total mix standard established by the Supreme Court").

Rather than establishing any test or threshold of total income, the Supreme Court and Third Circuit recognize that materiality is a mixed question of law and fact and, accordingly, is generally left to the trier of fact. *TSC Indus.*, 426 U.S. at 450; *Semerenko v. Cendant Corp.*, 223 F.3d 165, 178 (3d Cir. 2000) ("[t]he district court should decide the issue of materiality as a matter of law only if the alleged misrepresentations are so clearly and obviously unimportant that reasonable minds could not differ in their answers to the question").  As discussed above, in *Burlington* the Third Circuit fashioned a means of determining those instances where information is immaterial that does not rely on estimating or assessing the potential financial impact of an alleged fraud:  "to the extent that information is not important to reasonable investors, it follows that its release will have a negligible effect on the stock price."  114 F.3d at 1425.

In this case, ACE's stock price plummeted $7.05 per share following the disclosure of Defendants' contingent commission and bid-rigging schemes, demonstrating that the information was critically important to investors.  Consolidated Complaint, ¶¶3, 68.  On this basis alone, and regardless of what percentage of ACE's net income was impacted by the schemes, Plaintiffs have adequately alleged that the Defendants' misstatements and omissions were material.  Moreover, Plaintiffs have identified that ACE paid over $60 million in contingent commission kickbacks in

2003 alone, which not only guaranteed new and renewed insurance policies, but, with the bid-rigging schemes, inflated underwriting rates as well.  Thus, Defendants' undisclosed schemes touched on the heart of ACE's business practices.[4]  Consolidated Complaint, ¶¶24-35; *see also* Opposition to Motion to Dismiss at 19-23, 26.  Defendants themselves have conceded that the contingent commission and bid-rigging schemes were material, acknowledging in ACE's post-Class Period SEC filing that the end of the schemes "'could potentially impact ACE's future premium volume.'" Opposition to Motion to Dismiss at 21-22 (*citing* Ex. K to Defendants' Motion to Dismiss).

**Question 5:  If the amounts involved in the contingent commissions and bid-rigging schemes are insignificant, are they material?**

As discussed in response to Question 4, materiality is measured by whether there is a substantial likelihood that a reasonable person would consider the misstated or omitted information important.  In this case, investors (along with state Attorneys General, analysts and media commentators) plainly expressed that the contingent commission and bid-rigging schemes were material to them when Defendants' schemes were disclosed in October 2004.  Consolidated Complaint, ¶¶67-72.

Additionally, the contingent commission and bid-rigging schemes were far from insignificant.  These were illicit and illegal schemes that were central to ACE's business practices and designed to generate both more and higher premiums.  Consolidated Complaint, ¶¶24-35. Indeed, ACE paid over $60 million in kickbacks to insurance brokers in just one year to guarantee the flow of business.  For example, Plaintiffs have identified a $50,000 contingent commission kickback to Marsh that allowed ACE to secure an $80 million contract with the State of Connecticut. Consolidated Complaint, ¶27.  Internally, senior ACE executives acknowledged that there were

---

[4]     At the motion to dismiss stage, the Court "must accept as true all facts alleged in the complaint and view them in the light most favorable to" Plaintiffs.  *Merck*, 432 F.3d at 266.

"'concerns about potential legal issues for ACE'" and externally the Connecticut Attorney General later described "'the effect of these kickbacks is to steer contracts, corrupt competitive bidding, inflate costs and deceive customers.'" Consolidated Complaint, ¶¶32, 72. As the First Circuit held in *Roeder v. Alpha Indus.*, 814 F.2d 22, 26 (1st Cir. 1987), even "[i]llegal payments that are so small as to be relatively insignificant to the corporation's bottom line can still have vast economic implications. . . . Disclosure of the illegal conduct in obtaining [contracts], therefore, could have had a very significant impact on the ""'total mix" of information made available'" to . . . investors." *See also Galati v. Commerce Bancorp, Inc.*, No. 04-3252, 2005 U.S. Dist. LEXIS 26851, at *17 (D.N.J. Nov. 7, 2005), *aff'd*, 220 Fed. Appx. 97 (3d Cir. 2007) ("Information about a corporation's illegal conduct is inherently material for purposes of Rule 10b-5.").

**Question 6:  What is the economic loss if the stock price rebounded within six weeks?**

The economic loss, or damages, suffered by ACE investors is measured at the time the artificial inflation is removed from the stock and adjusted in accordance with the PSLRA's provision for limitation on damages. 15 U.S.C. §78u-4(e). In this case, assuming that all of ACE's stock price decline during the period October 14-19, 2004 was related to the fraud, Class Period purchasers suffered approximately $7.05 per share of economic loss as a result of the artificial inflation caused by Defendants' false statements and omissions. *See* Consolidated Complaint, ¶¶3, 104 and Opposition to Motion to Dismiss at 42-47. The PSLRA's provision for limitation on damages works as follows:

> For investors who held the subject security for 90 or more days after the end of the class period, "the award of damages to the plaintiff shall not exceed the difference between the [purchase price paid] by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."

> For investors who sold the subject security during the 90-day period following the end of the class period, "the plaintiff's damages shall not exceed the difference between the [purchase price paid] by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after

dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security."

15 U.S.C. §78u-4(e).

As a result of the increase in ACE's stock price during the 90-day period following the revelation of Defendants' contingent commission and bid-rigging schemes, the PSLRA would limit damages (economic loss) for certain investors. The following hypotheticals, using ACE's actual stock price for the relevant dates, demonstrate both the economic loss suffered by investors, even when ACE's stock price "rebounds," and the impact of the PSLRA damages provision:

> *Hypothetical 1* (sale immediately after the Class Period): The Alaska Ironworkers Pension Trust ("Alaska Ironworkers") purchased 8,273 shares of ACE stock on February 13, 2004 for $44.29/share and sold those shares on October 22, 2004, promptly after the end of the Class Period, for $34.50/share. The mean trading price for the period October 14-22, 2004 was $32.11 per share. The Alaska Ironworkers' economic loss would be the lesser of $7.05 per share or the purchase price minus the mean trading price for October 14-22, 2004 ($44.29-$32.11= $12.18/share). Accordingly, the Alaska Ironworkers suffered an *economic loss of $58,325* on its February 13, 2004 purchase of ACE securities (8,273 shares x $7.05/share);

> *Hypothetical 2* (sale during the 90-day period following the end of the Class Period): An individual investor purchased 10,000 shares of ACE stock on March 8, 2004 for $44.80/share and sold those shares on December 16, 2004 for $38.65/share. The mean trading price for the period October 14-December 16, 2004 was $38.79 per share. The individual investor's economic loss would be the lesser of $7.05 per share or the purchase price minus the mean trading price for October 14-December 16, 2004 ($44.80-$38.79= $6.01/share). Accordingly, the individual investor suffered an *economic loss of $60,100* on his March 8, 2004 purchase of ACE securities (10,000 shares x $6.01/share).

> *Hypothetical 3* (shares held through the 90-day period following the end of the Class Period): The Sheet Metal Workers' National Pension Fund ("Sheet Metal Workers") purchased 23,800 shares of ACE stock on February 13, 2004 for $45.09/share and held those shares for more than 90 days after the end of the Class Period. The mean trading price for the 90-day period after the end of the Class Period (October 14, 2004-January 12, 2005) was $39.73 per share. The Sheet Metal Workers' economic loss would be the lesser of $7.05 per share or the purchase price minus the mean trading price for the 90-day period after the end of the Class Period ($45.09-$39.73= $5.36/share). Accordingly, the Sheet Metal Workers suffered an *economic loss of $127,568* on its February 13, 2004 purchase of ACE securities (23,800 shares x $5.36/share).

Notably, the mere fact that a stock price increases, or rebounds, during the 90-day period after the end of the Class Period does not mean that the actual damages per share as a result of the fraudulent conduct is reduced, or that investors overreacted to the disclosure of the fraud.  Just as the continued decline of a company's stock price in the months after a corrective disclosure may be unrelated to an alleged fraud, so to could any increase in a company's stock price be driven by factors unrelated to a corrective disclosure.  Indeed, in this case, while ACE's stock price did increase approximately 15% in the 90 days after the end of the Class Period, during the same period the S&P 500 also increased, by nearly 10%, in value.  Obviously, the upward movement in the S&P 500 had nothing to do with any purported "overreaction" to the disclosure of ACE's contingent commission and bid-rigging schemes and there is no basis to assume that ACE's rising stock price during this period did either.

**Question 7:  How is the $500,000 advance to Willis fraudulent?**

Plaintiffs allege that Defendants engaged in contingent commission and bid-rigging schemes with insurance brokers to ensure that those brokers funneled increased business, and at higher premiums, to ACE.  As part of these schemes, ACE paid contingent commission kickbacks to brokers, such as Willis.  The allegations regarding the advance payment of a $500,000 kickback to Willis in December 2003 are a specific example of Defendants' undisclosed business practices and reliance on kickbacks to ensure new and continued business.  Consolidated Complaint, ¶28 (in exchange for the $500,000 kickback, ACE was promised "'more opportunity'" and Willis's "'focus on writing January 1st [2004] business'").

Standing alone, the Willis kickback evidences undisclosed, illegal conduct relied upon by Defendants to boost ACE's business and financial results.  *See Roeder*, 814 F.2d at 26 (even relatively insignificant illegal payments "can still have vast economic implications").  More importantly, the Willis kickback is just one example – representing just a fraction of the more than

$60 million in kickbacks ACE made in 2003 alone – of a pervasive business practice that Defendants engaged in at ACE. Defendants' failure to disclose these illegal activities and sordid business practices is what rendered their statements false and misleading under the federal securities laws.

**Question 8: Is the loss causation element satisfied when there is a drop in stock price on the basis of allegations of wrongdoing that soon proved insignificant or without foundation?**

As set forth by the Supreme Court in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005), in order to plead the loss causation element of a securities fraud claim, Plaintiffs are only required to give a "'short and plain statement'" in accordance with Fed. R. Civ. P. 8(a)(2) that provides Defendants with "'fair notice'" of the alleged loss. *See also Marsden v. Select Med. Corp.*, No. 04-4020, 2007 WL 1725204, at *2 (E.D. Pa. June 12, 2007) (*Dura* does not require a securities plaintiff to plead loss causation with particularity.). The Supreme Court held in *Dura* that a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347. As stated by the Third Circuit, a plaintiff must allege that "the drop in the value of a security is related to the alleged misrepresentation." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 223 (3d Cir. 2006). Plaintiffs' allegations easily meet these standards, regardless of whether Defendants contend the allegations of wrongdoing proved insignificant or without foundation. *See* Consolidated Complaint, ¶¶100-105; Opposition to Motion to Dismiss at 42-47.

Whether or not "the basis of allegations of wrongdoing . . . proved insignificant or without foundation" is, inherently, a factual question not properly decided on a motion to dismiss and, in any event, related to the elements of falsity and materiality. As an initial matter, the contingent commission and bid-rigging schemes have been admitted by Defendants (*i.e.*, Defendants do not deny the basis of the allegations of wrongdoing) and were certainly significant to ACE's business (*e.g.*, Defendants paid more than $60 million in contingent commission kickbacks in 2003 alone and,

according to *CBS Marketwatch*, engaged in "'sordid business practices involving payoffs and rigged bids.'" Consolidated Complaint, ¶67). Far from being insignificant or without foundation, following the end of the Class Period ACE cancelled its contingent commission and bid-rigging schemes and settled suits brought by various Attorneys General for more than $93 million. *See* Exhibit A attached hereto.[5]

Even absent the factually specific allegations here establishing the significance of ACE's contingent commission and bid-rigging schemes, any argument that the loss suffered by Plaintiffs was unrelated to Defendants' fraud, or that investors' concerns about the fraud "soon proved to be insignificant" is a factual determination that is not a proper basis for dismissal under Fed. R. Civ. P.12(b)(6). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, __ U.S. __, 127 S. Ct. 2499, 2509 (2007) ("courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true"); *Register v. PNC Fin. Servs. Group, Inc.*, 477 F.3d 56, 61 (3d Cir. 2007) (on a motion to dismiss, "'[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims'"); *see also In re Comverse Tech., Inc.*, No. 06 CV 1825 NGG RER, 2006 WL 2792757, at *3 (E.D.N.Y. Sept. 27, 2006) ("[A] court must conduct a loss causation analysis based solely on the allegations in the complaint.").

Hypothetically, assuming there is a Class Period-ending disclosure (which resulted in a significant stock price decline) that a Company falsely reported earnings which soon turned out to be incorrect or insignificant, an investor's suit would be dismissed for failure to plead the falsity or materiality of any misstatement, not for failure to plead loss causation. If, in fact, there was no basis

---

[5]    In accordance with Fed. R. Evid. 201, the Court can take judicial notice of ACE's SEC filing attached as Exhibit A (relevant portions of ACE's annual report on Form 10-K for 2007) for the purpose of determining what is stated in the documents (but, not to prove the truth of their contents). *Oran*, 226 F.3d at 289.

for the claim that earnings were falsely reported, the investor would be unable to plead that the company's financial statements were materially false or misleading in accordance with Fed. R. Civ. P.9(b) and the PSLRA.  Indeed, this would be true whether or not the company's stock price recovered after it was determined that the Class Period-ending disclosure was incorrect or insignificant.  In this case, however, the October 2004 disclosures were not incorrect, have not been withdrawn or proven false and, as alleged by Plaintiffs, uncovered a highly material aspect of ACE's business.

**Question 9:  Has the *Tellabs* decision affected the application or the viability of the efficient market theory?**

No.  The Supreme Court's decision in *Tellabs* is limited to the standards for pleading scienter under the PSLRA.[6]  The Supreme Court did not mention or discuss the efficient market hypothesis or in any way alter the Court's prior holding in *Basic* that there is a presumption that "publicly available information is reflected in [the] market price" of a security.  *Basic*, 485 U.S. at 247.

**Question 10:  What facts, if any, can the plaintiffs add in an amended complaint relating to the elements of scienter, loss causation and economic GAAP violations?**

Plaintiffs maintain that the Consolidated Complaint satisfies the pleading requirements of Fed. R. Civ. P. 9(b) and the PSLRA and that no additional facts are necessary to meet those pleading requirements.  Specifically, with regard to scienter, given that Defendants do not deny that they were aware of and approved the contingent commission and bid-rigging schemes, Plaintiffs have provided

---

[6]    In *Tellabs*, the Supreme Court held that in determining whether a plaintiff has adequately alleged scienter, "courts ***must consider the complaint in its entirety*** . . . .  The inquiry . . . is whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard" (emphasis added and in original).  *See also Tellabs*, 127 S. Ct. at 2509, 2511 (reiterating that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically").  A strong inference of scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a reasonable person would "deem the inference of scienter at least as strong as any opposing inference[.]"  *Id.*  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'"  *Id*. at 2510.

Defendants' knowledge of the undisclosed business practices and accounting manipulations at issue. *See* Consolidated Complaint, ¶¶10, 13, 16, 27-29, 32-34, 40, 48, 56, 64; Opposition to Motion to Dismiss at 35-38.  *See GSC Partners v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004) ("It is certainly true that 'in a non-disclosure situation, any required element of scienter is satisfied where . . . the defendant had actual knowledge of the material information.'").  Plaintiffs have also provided specific facts about the concrete benefits Defendants derived from their fraudulent conduct (*e.g.*, $48 million in incentive compensation, boosting ACE's credit rating and staving off debt covenants and completing a $500 million offering).  *See* Consolidated Complaint, ¶¶79-88; Opposition to Motion to Dismiss at 39-42.  These facts demonstrate that Defendants "had both motive and opportunity to commit fraud."  *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006).  As the Supreme Court held in *Tellabs*, a plaintiff's allegations need only be "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  127 S. Ct. at 2505.  Plaintiffs' allegations here are cogent and compelling and Plaintiffs are unaware of any additional facts that would significantly bolster those allegations.  To the extent, however, that there is any specific information that the Court believes is lacking from the scienter allegations, Plaintiffs would be prepared to address those concerns.

With regard to loss causation, as discussed above in response to Question 8, Plaintiffs maintain that they have easily exceeded the Supreme Court's mandate in *Dura* and provided Defendants with far more than the requisite "indication of the loss and causal connection that the plaintiff has in mind."  544 U.S. at 347.  *See* Consolidated Complaint, ¶¶100-105.  No more is needed to adequately plead loss causation.  To the extent the Court believes that additional facts

regarding market efficiency (*e.g.*, ACE's weekly trading volume, institutional ownership or analyst coverage) must be pled, Plaintiffs can and are prepared to do so.[7]

With regard to violations of Generally Accepted Accounting Principles ("GAAP"), Plaintiffs again maintain that they have made their allegations with the specificity required by Fed. R. Civ. P. 9(b) and the PSLRA. Plaintiffs have alleged which of ACE's financial statements were false and misleading, identified Defendants' specific violations of GAAP and quantified the impact of those violations. Consolidated Complaint, ¶¶90-99; Opposition to Motion to Dismiss at 31-34. To the extent, however, that there is any specific information that the Court believes is lacking from the allegations regarding Defendants' GAAP violations, Plaintiffs would be prepared to address those concerns.

### Question 11: Can a court consider pre- and/or post-class period admissions/proofs about the schemes?

Yes. In *Merck*, 432 F.3d at 271-72, the Third Circuit expressly held that on a motion to dismiss, a court can consider pre- and post-class period information in evaluating a plaintiff's scienter allegations.[8] Specifically, the Third Circuit rejected the district court's finding that allegedly false statements were not actionable because the allegations supporting a strong inference of scienter

---

[7]     Plaintiffs have already pled that ACE traded on the New York Stock Exchange and traded in an efficient market during the Class Period. Consolidated Complaint, ¶7. *See In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 208 (E.D. Pa. 2008) ("Courts have routinely held that securities traded on the NYSE . . . trade in an efficient market.") (citing *Oran*, 226 F.3d at 282 (describing the NYSE as "open and developed [where] the price of a company's stock is determined by all available material information regarding the company and its business")).

[8]     Courts routinely find that pre- or post-class period information is relevant in assessing scienter. *See, e.g., Greebel v. FTP Software, Inc.*, 194 F.3d 185, 202 (1st Cir. 1999) ("evidence of past practice may indeed be probative of present practice"); *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 425 (5th Cir. 2001) (defendant's post-class period concession amount to "special circumstances" supporting scienter); *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587 (PKL) (RLE), 2002 U.S. Dist. LEXIS 23829, at *6-*7 (S.D.N.Y. Dec. 11, 2002) ("simply stating that materiality and scienter are determined based on the facts at the time of the alleged misstatement does not mean that later occurring evidence is irrelevant").

were based upon information from outside the class period. *Merck*, 432 F.3d at 271. The Court

adopted the reasoning of two cases from the Second Circuit, *Novak v. Kasaks*, 216 F.3d 300 (2d Cir.

2000) and *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001). In *Novak*, the Second

Circuit rejected the district court's disregard of information from outside the class period and found

that inventory write-offs taken six months after the class period supported the inference that similar

inventory problems existed during the class period as alleged by the plaintiff. 216 F.3d at 313. In

*Scholastic*, the Second Circuit reasoned that allegations of what a defendant knew prior to the class

period were relevant to infer what defendant's knowledge was at the beginning of the class period.

252 F.3d at 72. Applying the reasoning from those cases, the *Merck* court held that the district court

erred in disregarding pre-class period data relevant to the defendant's scienter. 432 F.3d at 272.

District courts within the Third Circuit have followed *Merck* and utilized both pre- and post-

class period information in evaluating the sufficiency of a plaintiff's allegations. *See, e.g.*, *Aviva*

*Partners LLC v. Exide Techs.*, No. 05-3098 (MLC), 2007 U.S. Dist. LEXIS 17347, at *51-*55

(D.N.J. Mar. 13, 2007) (citing *Merck* and finding that both pre- and post-class period information

contributed to a strong inference of scienter); *Glover v. DeLuca, et al.*, No. 2:03-CV-0288, 2006 U.S.

Dist. LEXIS 76093, at *17-*19 (W.D. Pa. Sept. 29, 2006) (rejecting defendants' argument that

conduct before and after the class period should be "rejected categorically" in considering whether a

strong inference of scienter is pleaded).

Here, Plaintiffs have alleged both pre- and post-Class Period information that should be

considered by the Court in determining if the claims are sufficiently pled. *See* Consolidated

Complaint, ¶¶23, 30, 34, 69-72. For instance, Plaintiffs allege that as early as March 2003 – seven

months before the beginning of the Class Period – internal ACE e-mails evidence that Defendants

were providing inflated bids to Marsh & McLennan, an insurance broker, run by defendant Evan

Greenberg's brother, in an effort to help AIG, the insurer run by Greenberg's father, to secure certain

- 14 -

insurance business. Consolidated Complaint, ¶34. The e-mails describe the *quid pro quo* business practices Defendants were engaged in – if ACE provided an inflated quote on one set of business, it would be the winner of a different set of business for which a different insurer would provide the inflated quote. *Id.* Additionally, Plaintiffs allege that, immediately after the Class Period, Defendants admitted to participating in the illicit kickback and bid-rigging practices and quickly fired two low level executives that warned Defendants, and other senior executives at ACE, that the contingent commission and bid-rigging practices were wrong. *Id.*, ¶¶69-70. These allegations, considered in conjunction with the totality of Plaintiffs' allegations, support the strong inference of Defendants' scienter.

**Question 12: Can the class be limited to those who purchased and sold shares during the class period?**

No, the class in this case would include all investors who purchased ACE securities during the Class Period and sold or held those securities ***after*** the Class Period. *See* Consolidated Complaint, ¶¶1, 108. Plaintiffs are not aware of any authority that would limit a securities fraud class action to only those shareholders who purchased and sold shares during the Class Period.

**Question 13: Does 15 U.S.C. §78u-4(e), which governs limitations on damages, affect the maximum amount of damages the plaintiffs can recover?**

Yes, as described above in response to Question 6, depending on whether and when ACE shares purchased during the Class Period were eventually sold, the PSLRA's provision for limitations on damages, 15 U.S.C. §78u-4(e), would affect the maximum damages that Plaintiffs and ACE investors would recover in this litigation.

Plaintiffs will be prepared to further address these issues, as well as other issues related to Defendants' pending Motion to Dismiss, at the hearing scheduled for November 10, 2008.

DATED:  October 31, 2008                    Respectfully submitted,

                                            COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
                                            TOR GRONBORG
                                            DEBRA J. WYMAN


                                                      s/ TOR GRONBORG
                                            _____
                                                      TOR GRONBORG

                                            655 West Broadway, Suite 1900
                                            San Diego, CA  92101
                                            Telephone:  619/231-1058
                                            619/231-7423 (fax)

                                            LAW OFFICES OF MARC S. HENZEL
                                            MARC S. HENZEL (MSH 2062)
                                            273 Montgomery Avenue, Suite 202
                                            Bala Cynwyd, PA  19004
                                            Telephone:  610/660-8000
                                            610/660-8080 (fax)

                                            Attorneys for Lead Plaintiffs

S:\CasesSD\ACE Limited\MIS00055210.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 31, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 31, 2008.

                                                 s/ TOR GRONBORG
                                                 TOR GRONBORG

                                                 COUGHLIN STOIA GELLER
                                                       RUDMAN & ROBBINS LLP
                                                 655 West Broadway, Suite 1900
                                                 San Diego, CA  92101-3301
                                                 Telephone:  619/231-1058
                                                 619/231-7423 (fax)

                                                 E-mail: torg@csgrr.com

# Mailing Information for a Case 2:05-md-01675-TJS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **STEPHEN A. COZEN**
  scozen@cozen.com,cwilliams@cozen.com

- **GEORGE M. GOWEN , III**
  ggowen@cozen.com

- **TOR GRONBORG**
  torg@lerachlaw.com,christina@lerachlaw.com,e_file_sd@lerachlaw.com

- **MARC S. HENZEL**
  mhenzel182@aol.com

- **NEAL S. MANNE**
  nmanne@susmangodfrey.com,mreeves@susmangodfrey.com

- **UDOKA NWANNA**
  udokan@lerachlaw.com

- **DEBRA J. WYMAN**
  debraw@lerachlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
JOHNNY W. CARTER
SUSMAN GODFREY LLP
1000 LOUISIANA
SUITE 5100
HOUSTON, TX 77002-5096

MICHAEL GEISER
SUSMAN GODFREY LLP
1000 LOUISIANA
SUITE 5100
HOUSTON, TX 77002-5096

H. LEE GODFREY
SUSMAN GODREY LLP
1000 LOUISIANA
SUITE 5100
HOUSTON, TX 77002-5096
```

**JEFFREY SEELY**
SUSMAN GODFREY LLP
1000 LOUISIANA
SUITE 5100
HOUSTON, TX 77002-5096